## Case No. 6,169.

HARTSHORN et al. v. WRIGHT et al.

[Pet. C. C. 64.][1]

Circuit Court, D. New Jersey. April Term, 1813.

EJECTMENT — EVIDENCE — SHERIFF'S DEED—ADMINISTRATOR'S DEED — BOUNDARY — WATER COURSE—ACTS OF AGENT — RATIFICATION—NEW TRIAL.—JURISDICTION OF CIRCUIT COURT.

1. A sheriff's deed cannot be given in evidence, without producing the judgment and execution under which the sale was made; these documents being necessary to shew that the sheriff had authority to sell.

[Quoted in Armstrong v. Jackson, 1 Blackf. 212. Cited in Crowell v. Meconkey, 5 Pa. St. 172.]

[1] [Reported by Richard Peters. Jr., Esq.]

2. A deed executed by administrators, under an order of the orphan's court, cannot be read in evidence, without producing the order of the court.

3. The proprietor of adjoining lands, who is also owner of the bed of a creek, may grant and convey the bed of the creek, separate from the land which bounds it.

4. A water course is the safest boundary of real estate, as it is a natural boundary.

[Cited in Baltimore & P. R. Co. v. Magruder, 34 Md. 82.]

5. Quaere, if a purchaser from the assignees of a bankrupt, must, in an ejectment for the property purchased, prove the petitioning creditor's debt, and the proceedings under the commissioners of bankruptcy?

6. The unauthorized acts of an attorney or agent, are not so absolutely void, as that the constituents cannot ratify and give them validity.

7. At the request of the parties to a cause, the jury may express an opinion distinct from their verdict.

8. If evidence has been given on the trial, that the value of the land in dispute exceeds five hundred dollars, although the jury in their verdict did not find that fact, the court will not grant a new trial; evidence after verdict, by witnesses on affidavit, would be sufficient to fix the jurisdiction of the circuit court.

[Cited in Smith v. Jackson, Case No. 13,065; Greene v. Bateman, Id. 5,762; Kanouse v. Martin, 15 How. (56 U. S.) 208; Crawford v. Burnham, Case No. 3,366; Sharon v. Terry, 36 Fed. 349.]

Ejectment [against Wright and Dill] for a saw-mill, and ten acres of land, covered with water, &c. Two of the counts were on the demise of [Pattison] Hartshorn and others, and two upon the demise of Robert Waln.

Plaintiff's Title.—A resurvey dated in 1714, to Mahlon Stacey, for 800 acres of land, lying on each side of Assanpink creek, including the mouth, where it empties itself into the Delaware. Mahlon Stacey, the son and heir of the grantee, conveyed the above land to William Trent; whose son and heir, James Trent, in 1729, conveyed to William Morris 300 acres of the above land, lying on the south side of the creek, and bounded by certain courses and distances to the Delaware, and crossing over at the mouth, to the north side of the creek, and so up the courses of the creek, until a south course will strike the place of beginning, on the south side. Hooper, to whom the right to this land had come by regular conveyances, conveyed 29 acres of it by deed, in 1765, to Robert Waln; bounded by the corner of the creek on both sides, from the mouth up to a certain point, considerably above the place in dispute. The daughter of Robert Waln, being entitled to this 29 acres of land, by devise from her father, intermarried with Gideon H. Wells, in 1791. In January, 1803, a commission of bankruptcy was taken out against Wells, who was declared a bankrupt, and all his estate conveyed, by the commissioners, to certain assignees, who advertised the same to be sold at public auction; in which advertisement, a grist-mill, belonging to this tract of 29 acres, and lying on the creek, about one hundred and fifty

yards above the property in dispute, is particularly mentioned, but not the creek running from thence to the Delaware. The whole of the 29 acres, for the life of Wells, was struck off to Robert Waln, Jun. as the highest bidder; to whom a conveyance, dated 30th May, 1803, was made by the assignees; in which deed, the bankruptcy, commission, and the assignment are recited. On the 3d May, 1803, Wells and his wife, mortgaged to Robert Waln, Jun. the above 29 acres of land, for securing the repayment of the money which Waln had paid for the life estate; and, on the 1st of June, 1804, Waln conveyed all the above land, except a few lots adjoining the creek, to the lessors of the plaintiff, Hartshorn and others; in trust to receive and pay over the profits to the wife of Wells, or to permit her, otherwise, to receive them to her separate use, during her life. Possession of this property, was fully proved to have accompanied this title for more than fifty years.

The defendant, who had purchased the land adjoining the creek on the north and south sides, about one hundred and fifty yards below the grist-mill, and the same distance above the mouth of the creek; built a saw-mill on the north side, which the plaintiff insisted was wholly or in part on the bed of the creek; and that the forebay, as well as the greater part of the dam, which extended from the north to the south bank of the creek, were also in the bed of the creek. In respect to the ancient course of the creek, and the position of the mill, the forebay and the wheel; a number of witnesses were examined, and a great deal of contradictory testimony given. The water of this creek is fresh, innavigable, and without tide.

The defendant, to prove his title to the land adjoining the creek, whereon he contended the mill was built; offered in evidence, a deed from the sheriff to M. Thompson, which recited a judgment and execution against Stacy Thomas, for a certain sum, which was levied on this land, and sold to Thompson, as the highest bidder; and also a deed from the administrators of M. Thompson to A. Woodruff, and a deed from Woodruff to the defendants. These deeds were objected to; the first, because the judgment and execution produced in evidence, were for a very different sum from that mentioned in the deed; and the second, because the order of the orphan's court, directing the administrators of Thompson to make the deed, in fulfilment of a contract of sale made by the intestate with Woodruff, in his life time, under the act of assembly, which authorises that court to make such an order, was not produced.

THE COURT decided, that the sheriff's deed could not be given in evidence, without producing the judgment and execution under which he made the sale; these documents being necessary to shew that he had authority to sell. If so, a judgment and execution, differing entirely from that recited in the deed, is the same thing as if no judgment

were produced. As to the second point; it is most clear, that, without producing the order of the orphan's court, authorising the administrators to make the deed, they could convey no title; and consequently the deed ought not to be read. The order was afterwards produced, and the deed of course was read.

The objections, made by Richard Stockton and Horace Stockton for defendants, to the plaintiff's right of recovery, were the following:

First. That the bed of a creek or fresh water stream, is so inseparably connected with the adjoining land on the bank, that it cannot be separated, but will belong one half, to the owner of the adjoining land on one side, and the other, to the owner of the adjoining land on the other side. Davis, 155, Harg. Law Tracts, 5; 12 Mod. 510; 1 Swift, 341; Co. Litt. 152a; Noy's Maxims, 13, 14.

Second. The uncertainty in the description of the land, in the deed from Trent to Morris; the courses of a creek being too indefinite a boundary; and, in this case, no plot of the land has been produced, to shew the beginning and course of the western line.

Third. The plaintiff cannot recover under the demise of the trustees, without proving the debt of the petitioning creditor, which has not been done; for without this, it does not appear that the commissioners had any authority to declare Wells a bankrupt, or to assign his property to the assignees, under whose title the trustees claim. Coke, Bankr. Law, 312; Doug. 205; Cas. Temp. Hardw. 136, 176. If it had not been for the 34th section of the bankrupt law [of 1800 (2 Stat. 30)], the bankrupt, in a suit against him by his creditors, could not protect himself, without proving the regularity of the proceedings against him; and this and the 56th section, providing specially for inferior evidence in the specified cases, proves the general principle of law. The provisions are similar, in the 34th section, to those in the English bankrupt law. 1 Coke Bankr. Law, 336. In suits against other persons than the bankrupt, every thing must be proved; and particularly the petitioning creditors' debt, which is the foundation of the commissioners' authority. 5 Term R. 655; 3 Esp. Cas. 219. The 56th section has been decided to apply, strictly, to suits brought by the assignees against a debtor of the bankrupt. 1 Mass. 67; 5 Mass. 303; 1 Bin. 263; 2 H. Bl. 444. If the plaintiff cannot recover on the title of the assignees, he cannot upon the title derived under the mortgage to Robert Waln; because Waln, by the indenture from the assignees, having admitted that Wells had regularly been declared a bankrupt, is estopped from denying it; and of course Wells had no right to convey to Waln. By impeaching the title derived under the assignees, it does not follow that the title remained in Wells; but merely that the plaintiff, in making out his case, has not produced the necessary evidence to support it.

Fourth. If the third objection should not be sufficient, then the deed from the assignees is void; because this property was not described in the advertisement.

Fifth. It was contended, that the weight of evidence, to prove that no part of the saw-mill is in the bed of the creek, is in favour of the defendants.

Griffith and Williamson for the plaintiff; in answer to the first objection, cited a case from 2 Strange, to prove that though a right of way or fishery may exist in the public, yet the right of soil may be in A, who may maintain an ejectment.

WASHINGTON, Circuit Justice (charging jury). This is an ejectment, the object of which is to recover the saw-mill, built by the defendants, and the land covered by the dam and pond. It is necessary for the plaintiff to prove a title in himself, and also possession in the defendant. The plaintiff has produced a regular paper title from the proprietors of New Jersey, down to the lessors of the plaintiff; unless the objections made to that title, or some one of them, should be deemed sufficient. Upon the question of title, therefore, it will be only necessary to examine those objections.

The first is, that the bed of a creek, cannot be separated from the adjoining land, and granted to a person not owning the adjoining land. This objection, at the first view of it, appears to be highly unreasonable. Whilst the title remains with the grantor, it is admitted, that it is equally valid in respect to the bed of the creek, as to the adjoining land; and may be used by the owner for all the purposes to which water may be applied, and for which it is peculiarly valuable; and yet, it is said to be a species of property, which cannot be granted away by him, who has full dominion over and property in it. It would follow from this, that if a man, owning land on each side of a stream, should grant the bed of the creek to another, for the purpose of erecting water works or otherwise; that he might, nevertheless, against his own grant, claim the thing granted, as an appendage to his adjoining land; which would be a strange anomaly in the law. In support of this doctrine (and, before it can be admitted, it should be made out by clear authorities) Harg. Law Tracts, p. 5, has been relied upon. In my apprehension, this authority is against the defendants. "Prima facie," the writer says, "the owner of the adjoining land is entitled to go to the middle of the stream;" and this is very reasonable, where his grant does not expressly bind him by the margin of the stream. In England, the original grants of lands are seldom to be found, and, immemorial use, or prescription, must, in most instances, be resorted to, for the purpose of establishing boundaries. In cases, therefore, of land lying on a fresh water stream, where no precise boundaries can be proved, the presumption (to use the expres-

sion of the author) is, that it extends to the middle of the stream; or that the whole stream is included, if he owns the adjoining lands on each side. But the same author proceeds to say, that the stream may be separated from the adjoining land by prescription; so that one man may own the bed of the stream, and another the adjoining lands. Now, this is conclusive upon the point, because if they may be separated by prescription, they may by grant; the former always pre-supposing the existence of the latter, at some past period of time, but which has since been lost, or destroyed.

As to the second objection. This objection, if intended to impeach the validity of the deed, for uncertainty in the description of the thing granted, is entirely without foundation. The place of beginning, and all the other corners, are precisely mentioned and described by course and distance to a tree on the north side of the creek, and thence up the courses of the creek to a spot from whence a south course will strike the beginning. This spot, though not marked by any visible object, is susceptible of precise location by aid of the compass, as there could be but one spot on the margin of the creek, whence a due south course would strike the beginning. As to the boundary on the north side, I have always supposed a water course to be the safest, because it is a natural boundary. It is possible, that in process of time, the stream may in some measure change its course; but this is no objection to the description, though it may become difficult to prove the ancient course. As to the want of a diagram, to point out to the jury, the beginning of the land described in the deed to Morris, it is clear that such evidence is unnecessary. It is obvious upon the face of the papers, that the land in dispute is within the boundaries of the 300 acres. since it appears that it is only about 150 yards from the mouth of the creek, and the beginning is upwards of half a mile.

Third. It is unnecessary to give any opinion upon the title derived under the assignees. That the assignees, in actions brought by them, (except in those brought by them against the debtors of the bankrupt under the fifty-sixth section,) must prove the debt of the petitioning creditor, is fully established by the authorities; as also, that this section only extends to such actions for debts, duties or demands. Whether the principle applies to a purchaser under the assignees, is not decided in the cases cited; and no opinion is intended to be given by this court, because I am clearly of opinion, that if the plaintiff cannot make out his title under the assignees, he can rely upon the title derived under the mortgage deed from Wells and wife to Robert Waln. Why is the title of the assignees disputed? The answer is, because it does not appear that the persons, upon whose petition the commission issued, were creditors of the bankrupt, no evidence having been offered on this trial, that any debt was in fact due to the petitioner; and of course the commission, which is the foundation of the whole proceedings, does not appear to have issued legally, the proceedings of persons acting under a special authority, not being evidence, in themselves, of the proper exercise of the authority. If so, then the commission improvidently issued; because, what does not appear, and what is not, are in law the same thing. The court must take it for granted, that there was no petitioning creditor, within the meaning of the law; and, if so, all is void. The estate of Wells, therefore, never passed out of him to the assignees; and, of course, he had a right to mortgage his life estate to Robert Waln. If the plaintiff had counted upon the demise of Wells and wife, and the defendants had wished to set up the title of the assignees in order to nonsuit him, they must have given the very evidence which the plaintiff is required to give in this case; and, failing to do so, the same conclusion must have resulted, viz. that the commission had not regularly issued. The recital in the deed from the assignees, that Wells was regularly declared a bankrupt, cannot bind the plaintiff to admit the fact, in order to defeat him upon the title set up under Wells; and also to enable the defendants, to defeat him under the title set up under the assignees:— That is to say, to put it in the power of the defendants to blow hot and cold, and assert that the assignment was regular and not regular; which is the amount of the objection.

Fourth. This objection is put out of the way, if the title under the mortgage is relied upon. But there is nothing in it, or nothing of which the defendants can avail themselves. If the assignees proceeded improperly, so as to affect the interests of the creditors, they might complain, and might perhaps set aside the sale, if the circumstances were strong enough for the purpose. But, even the unauthorised act of an attorney, is not so absolutely void, that the constituents may not ratify and give it validity.

The second question, for the consideration of the jury, is, whether the defendants have been proved to be in possession of the property claimed by the declaration, or any part of it. As to the mill, the evidence being entirely contradictory, in relation to this part of the property; some of the witnesses testifying, that, in their opinion, no part of the mill or wheel is in the ancient bed of the creek, others, that the wheel and forebay are part of the mill, and others again, that a part only of the wheel and forebay is; the court leaves this question to the jury, who are alone competent to judge of the credibility of the witnesses, and to weigh their testimony. As to the dam, or at least a part of it, there is no dispute but that it is in the bed of the creek; and consequently such part, and the land covered by the water of the pond, belong to the plaintiffs. If so, the verdict must

be for the plaintiffs. At the request of the parties, and for the regulation of their conduct in relation to the mill and its appendages, the jury may express an opinion distinct from their verdict.

The jury found for the plaintiff, and the foreman stated, that the jury were of opinion, that half of the forebay and wheel to the south were in the ancient bed of the creek.

NOTE. In the above cause, the defendants moved in arrest of judgment, that the jury had not found that the value of the land exceeded 500 dollars.

WASHINGTON, Circuit Justice. It would be sufficient to fix the jurisdiction, if the value were now proved by witnesses or on affidavit; and, as the evidence given of the value of the tract, proved it to exceed, very far, the sum of 500 dollars, the court cannot grant a rule to show cause why the judgment should not be arrested. (The value was stated in the declaration.)